IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| Sammy Hicks, III, | ) | Civil Action No. 2:21-cv-4068-RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | COMPLAINT |
| | ) | |
| Neeson T. Levinson, | ) | Jury Trial Demanded |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Sammy Hicks, III ("Plaintiff"), by and through his undersigned counsel, files this complaint against Neeson T. Levinson ("Defendant"), alleging as follows:

1. Plaintiff is a resident of Lutz, Florida and is currently the sole shareholder of Harbor Services, Inc. ("Harbor Services" or the "Company"), a South Carolina corporation located in Mount Pleasant, South Carolina. Harbor Services is a certified "Service-Disabled Veteran Owned Small Business" that provides construction contracting services to governmental agencies. Harbor Services is also an 8(a) certified disadvantaged business pursuant to Section 8(a) of the Small Business Act.

2. Defendant is a resident of Hilton Head, South Carolina. He formerly owned all shares of Harbor Services and operated the business until March 1, 2021, when he sold all stock in the Company to Plaintiff.

## GENERAL ALLEGATIONS

3. In this lawsuit, Plaintiff is seeking damages he incurred as a direct result of Defendant's false representations and material non-disclosures made in connection with

Defendant's sale of Harbor Services to Plaintiff. At the time of sale and for some period leading up to it, Defendant knew that the U.S. Department of Veteran's Affairs ("VA") was likely to terminate the largest contract in Harbor Services' portfolio of business (the "Atlanta VA Contract") – and, in fact, Defendant recommended and encouraged the Government to terminate that contract – but Defendant deliberately and intentionally withheld that information from Plaintiff.

4.      Defendant expressly represented and warranted to Plaintiff in the parties' Stock Purchase Agreement ("SPA"), a copy of which is attached hereto as **Exhibit A**, that there was no threat of termination of any of Harbor Services' ongoing material contracts, which Plaintiff was relying on to support the value of the Company he was paying $3 million to acquire, *while at the same time Defendant himself was recommending to the VA that it should terminate the largest of those material contracts – the Atlanta VA Contract.*

5.      Although Plaintiff performed reasonable due diligence before closing pursuant to a Non-Disclosure Agreement and Letter of Intent to purchase, Plaintiff had no access to communications in which Defendant urged the VA to terminate the Atlanta VA Contract at the same time that Defendant was expressly and falsely representing to Plaintiff that all material contracts were in full force and effect with no threat of termination. All financial and contract disclosures provided by Defendant during due diligence reflected that the Atlanta VA Contract was a viable work in progress for Harbor Services and that it was expected to continue to provide substantial revenue and profits into the future.

6.      Because the Atlanta VA Contract represented approximately 40% of the Company's projected revenue and profits, Defendant's misrepresentations concerning the viability of that contract were especially material, leading Plaintiff to agree to pay substantially more than the Company was worth.

7.      Simply put, while in a position of trust and confidence with Plaintiff, Defendant sold all stock in the Company to Plaintiff with full knowledge that the Company's largest source of ongoing revenue was about to end, with full knowledge that Plaintiff was unaware of this critical fact, with full knowledge that Plaintiff was relying entirely on Defendant to make a complete and honest disclosure about the condition of the business, without providing any clue to Plaintiff that the Atlanta VA Contract was about to be terminated based on Defendant's own recommendation, and while expressly representing to Plaintiff in the SPA that the Atlanta VA Contract was in full force and effect and was *not* threatened with termination. As a result of his reasonable reliance on Defendant's false representations and warranties and material non-disclosures, Plaintiff was induced into purchasing Harbor Services for substantially more than the actual value of the Company, and Defendant received a windfall. Plaintiff, therefore, is entitled to recover actual and punitive damages in an amount to be determined by a jury, as well as interest, costs, and attorneys' fees.

## VENUE AND JURISDICTION

8.      This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy, exclusive of interest and costs, exceeds $75,000.00 as specified in 28 U.S.C. § 1332, and every issue of law and fact is wholly between citizens of different states.

9.      Venue is proper in this District and in the Charleston Division pursuant to 28 U.S.C. § 1391(b)(1)-(2) and Local Rule 3.01(A)(1) because Defendant resides in this District; because a substantial part of the transactions or occurrences underlying this Complaint occurred within the Charleston Division of this District; and based on an exclusive venue clause in the SPA.

## FACTUAL ALLEGATIONS

10.    Defendant was the sole shareholder and President of Harbor Services beginning in December of 2007, until Defendant sold all shares in the Company to Plaintiff effective as of March 1, 2021.

11.    Defendant and Plaintiff began negotiating the stock purchase transaction in October 2020. Viking Mergers, Inc. ("Viking") served as a broker in the purchase and sale of Harbor Services. As a part of the discussions and to facilitate disclosure of all pertinent information, Plaintiff and Viking, as Defendant's agent, entered into a Non-Disclosure Agreement on or around October 18, 2020 (the "Non-Disclosure Agreement"), and Plaintiff and Defendant entered into a Letter of Intent relating to the purchase on November 4, 2020 (the "Letter of Intent"). Thereafter, Plaintiff conducted reasonable due diligence before closing ("due diligence period"). Defendant agreed in the Letter of Intent to negotiate a final stock purchase agreement in good faith and to exercise all reasonable efforts to consummate the sale by March 1, 2021.

12.    Viking participated in the due diligence process. Viking set up a Sharepoint site and Defendant uploaded due diligence documents relating to Harbor Services' business, contracts, and finances to that site for Plaintiff to review.

13.    Viking provided Plaintiff with a brochure stating, among other things, "This is a confidential business offering. Neither the employees, customers, nor suppliers are aware of a potential sale. Prospective purchasers are cautioned to abide by the strict guidelines of the Non-Disclosure and Confidentiality Agreement they signed."

14.    During the due diligence period, Plaintiff reposed trust and confidence in Defendant, as is reflected in the Non-Disclosure Agreement and the Letter of Intent, to share all material information relating to the ongoing value of Harbor Services, including the viability of the Company's Material Contracts. Because Harbor Services was a closely held company owned

solely by Defendant and because of the confidential nature of the transaction, Plaintiff had no other means by which to obtain information about the financial condition of the Company and/or the viability of ongoing contracts. Defendant knew Plaintiff was relying entirely on disclosures made during the due diligence period to prepare a final valuation of the stock in Harbor Services and arrive at a price to be paid by Plaintiff to purchase the Company's stock from Defendant.

15.     Based upon the special trust Plaintiff reposed in Defendant and the confidential nature of the acquisition discussions and related due diligence, Defendant, at all pertinent times, owed Plaintiff a duty to disclose all material information pertaining to the operations and financial condition of the Company. Defendant owed Plaintiff the utmost duties of care, loyalty, candor and good faith.

16.     Plaintiff, who was represented by counsel in this transaction, prepared a due diligence list that included the books and records, tax records, historical financials, contracts, work in progress reports, and personnel files of Harbor Services, among other items of relevant information.

17.     Plaintiff specifically requested a list of "significant overbilling or underbilling" on any projects and a list of any "doubtful accounts." Defendant denied having any "significant overbilling or underbilling" or any "doubtful accounts."

18.     Plaintiff requested in the due diligence period a "list of all major contracts or understandings not otherwise previously disclosed . . . , indicating the material terms and parties" and for any material contracts, "whether any party is in default or claimed to be in default." Plaintiff requested all "project contracts, change orders, and addendums" for ongoing projects and Defendant made no disclosures relating to the pending change orders, delays in approvals, and imminent threatened termination of the Atlanta VA Contract based on Defendant's own recommendation.

19.    In addition to providing the materials requested in the due diligence period, Defendant also made certain affirmative representations and warranties in the SPA relating to the financial condition of the Company and the viability of the Company's contracts that were in progress (deemed "Material Contracts" in the SPA).

20.    During due diligence, Defendant expressly represented to Plaintiff that the Company's Material Contracts represented future Company revenues of nearly $16 million and expected future profits of over $2 million.

21.    In September of 2019, Harbor Services was awarded the Atlanta VA Contract, which was designated as Contract #36C24718D0147, Order #36C24719N0870 (Project 508-17-101 Renovate Geriatric Med/Psych Inpatient 5th Floor located in Atlanta, Georgia at the Atlanta VA Medical Center).

22.    Pursuant to the Atlanta VA Contract, the VA agreed to pay Harbor Services over $9 million to perform certain construction-related services. The total expected cost for Harbor Services to perform the Atlanta VA Contract was slightly more than $8 million.

23.    Financial records provided by Defendant to Plaintiff during the due diligence period reflected that the Atlanta VA Contract was the largest Material Contract and project being performed by Harbor Services and represented approximately 40% of the Company's expected cash flows and profits on those Material Contracts. These due diligence materials reflected that the Atlanta VA Contract represented over $6.6 million in expected future revenue and over $820,000 in expected future profits.

24.    Upon information and belief, during the period leading up to Plaintiff's purchase of Harbor Services, Harbor Services was seeking contract modifications from the VA for the Atlanta VA Contract to reflect approximately $1 million in additional billings arising from a change in the project scope. The VA, however, was slow to approve the necessary change orders.

Harbor Services submitted applications for modifications to the Atlanta VA Contract, but the VA did not timely approve these proposed modifications. As a result, and unbeknownst to Plaintiff, work on the Atlanta VA Contract had slowed to a standstill by February 2021.

25.    Unbeknownst to Plaintiff, at the very time Plaintiff was conducting due diligence to purchase Harbor Services and Defendant was representing to Plaintiff that the Atlanta VA Contract would be the source of substantial ongoing revenues and profits for the Company, Defendant decided that the Atlanta VA Contract was no longer viable for Harbor Services and he began urging the VA to terminate the Atlanta VA Contract for convenience, which the VA had a right to do under the Atlanta VA Contract. Under such circumstances, Harbor Services' work on the Atlanta VA Contract would stop and Harbor Services would not receive the anticipated revenues and profits on the project as disclosed to Plaintiff.

26.    On February 12, 2021 (approximately two weeks before the closing of the sale of Harbor Services from Defendant to Plaintiff), in a recorded telephone conversation with VA representatives, Defendant stated that as a result of delays in obtaining VA approval for the necessary change orders, he was being required to work at 15% efficiency on the Atlanta VA Contract project, and this was unacceptable. Defendant stated, "If the VA can't get what we need to proceed, then this project needs to be cancelled." He continued, "I don't want to be put in a holding pattern for three months and then three months down the road they cancel it because they can't get funding. Our back is against the wall right now." Defendant further stated, "We are at a standstill right now, we have no plans to move forward." He continued, "I recommend cancelling the contract for the convenience of the government because I can't tie up $10 million of bonding and be in a holding pattern for an undetermined period of time."

27.    Defendant informed the VA in that phone call that he would "absolutely" send an email to the VA confirming his recommendation to terminate the Atlanta VA Contract.

28.    At no time prior to March 1, 2021 did Defendant disclose to Plaintiff that Defendant had expressly recommended to the VA that the VA terminate the Atlanta VA Contract for convenience, or that the Atlanta VA Contract was at substantial risk and threat of being terminated.

29.    Based upon the disclosures and representations Defendant made to Plaintiff during the due diligence period and in the SPA (including the representations that the Atlanta VA Contract was the largest and most profitable ongoing Material Contract of Harbor Services and that there was no threatened termination of this or any other Material Contract), Plaintiff prepared a formal business valuation and negotiated a sales price of $3 million for his purchase of Harbor Services from Defendant.

30.    Plaintiff's purchase of all stock of Harbor Services from Defendant was accomplished through the SPA effective as of March 1, 2021, which was the date of the closing of Plaintiff's purchase of the Company. Under the terms of the SPA (a copy of which is attached hereto as **Exhibit A**), Plaintiff paid Defendant $2,835,000 at closing and Defendant financed $165,000 with a seller's note bearing 7.5% annual interest and a ten-year term. Harbor Services also distributed $2.6 million of cash from its accounts to Defendant.

31.    In the SPA, Defendant promised to disclose all "Material Contracts" as of closing. Even though Defendant was fully aware that the Atlanta VA Contract was threatened with termination by the VA based on Defendant's own recommendation, the list of Material Contracts attached to the SPA reflected the Atlanta VA Contract had an original value of $9,287,547, with modifications of $0.00, and a "Current Contract Value" which was identical to the original value.

32.    In Section 4.15(b) of the SPA, Defendant expressly represented and warranted to Plaintiff that:

> each Material Contract is (i) in full force and effect and is valid and enforceable in accordance with its own terms, (ii) to Seller's knowledge, the Company is not in default under or in breach of the material terms of any Material Contract; and (iii)

> *no written termination notice has been delivered by any party to any other party nor to the knowledge of Seller has termination been threatened with respect to any Material Contract.*

SPA, § 4.15(b) (emphasis added). In fact, however, Defendant had actual knowledge that there was a substantial threat of termination of the Atlanta VA Contract based on Defendant's own recommendation to terminate.

33.    Defendant also represented in the SPA as follows:

> As of the date of the Agreement, there is no pending or, to the knowledge of Seller, threatened Proceeding or investigation by any Governmental Entity, to restrain or prevent the consummation of the transactions contemplated by this Agreement.

SPA, § 4.06. In fact, however, Defendant had actual knowledge that termination of the entire Atlanta VA Contract was threatened based on Defendant's own recommendation.

34.    Defendant further represented in Section 4.11 of the SPA that

> for a period of one year prior to the Closing, there has been no material adverse effect (i) on the assets, business, financial condition or results of operations of the Company, and (ii) the business of the Company has been conducted in the ordinary course and in substantially the same manner as previously conducted.

SPA, § 4.11. In fact, however, Defendant had actual knowledge that the VA was likely to terminate the entire Atlanta VA Contract for its own convenience based on Defendant's own recommendation, and that this would have a material adverse effect on the assets, business, financial condition and results of operations of the Harbor Services.

35.    On April 6, 2021, barely more than one month after the closing of Plaintiff's purchase of Harbor Services, the VA formally terminated the Atlanta VA Contract for convenience, in accordance with Defendant's earlier recommendation that had been concealed from Plaintiff.

9

36.     As a result of the termination of the Atlanta VA Contract, Plaintiff realized his valuation of Harbor Services was grossly inflated and that Defendant had made material misrepresentations and non-disclosures during the due diligence period and in the SPA.

37.     Pursuant to the dispute resolution provisions in the SPA, Plaintiff sought to negotiate a settlement of his claims against Defendant through mediation with Defendant, but these efforts were unavailing.

38.     As a result of Defendant's actions, Plaintiff has suffered damages, actual and consequential, including but not limited to paying an inflated amount for his purchase of Harbor Services from Defendant.

39.     Defendant also is liable to Plaintiff for all attorneys' fees, professional fees, and other costs incurred in connection with this litigation.

## COUNT ONE
### (Breach of Contract as to the Stock Purchase Agreement)

40.     Plaintiff incorporates Paragraphs 1 through 39 as if set forth fully herein.

41.     Plaintiff entered into the SPA with Defendant for the acquisition of all of the stock of Harbor Services for $3 million, including taking out a loan from Defendant in the amount of $165,000 and agreeing to pay to Defendant rent and other valuable consideration.

42.     Plaintiff has fully performed all of his material obligations under the SPA.

43.     Defendant has breached the SPA in the following particulars:

a.  In Section 4.15(b) of the Representations and Warranties, Defendant falsely represented that all Material Contracts were in full force and effect, no written termination has been provided, "nor to the knowledge of Seller has termination been threatened with respect to any Material Contract." In fact, Defendant had actual knowledge that there was a substantial threat of termination of the Atlanta VA Contract based on Defendant's own recommendation to terminate.

b.  In Section 4.15 of the Representations and Warranties, Defendant falsely represented that the Atlanta VA Contract continued to have a value of

$9,287,547, when that valuation was based on the false assumption that the Atlanta VA Contract would continue, contrary to Defendant's own recommendation that the Atlanta VA Contract be terminated for convenience;

c.  In Section 4.06 of the Representations and Warranties, Defendant falsely represented there was no pending or threatened proceeding or investigation by any Governmental Entity to restrain or prevent the consummation of the transactions contemplated by the SPA, when in fact Defendant knew the VA was likely to terminate the Atlanta VA Contract based on Defendant's recommendation;

d.  In Section 4.07, of the Representations and Warranties, Defendant falsely represented that the "Financial Statements . . . fairly present . . . the financial condition, results of operations and cash flows of the Company" when in fact all financial disclosures were based on the assumption that the largest contract in the Harbor Services portfolio – the Atlanta VA Contract – would continue to be performed, when Defendant knew that the Atlanta VA Contract was likely to be terminated based on his own recommendation; and

e.  In Section 4.11 of the Representations and Warranties, Defendant falsely represented there were no material adverse effects on the financial condition or operations of the Company for a period of one year before closing when in fact Defendant was personally aware – and in fact he suggested and recommended – that the VA would terminate the Atlanta VA Contract.

44.    In addition to these express breaches, Defendant also breached the implied duty of good faith and fair dealing that was inherent in the SPA, and the express duty of good faith set forth in the Letter of Intent dated November 4, 2020.

45.    Defendant also breached his duty during the due diligence period, as set forth in paragraph 5 of the Letter of Intent, to conduct the business using "all reasonable efforts to preserve . . . its relationships with customers and others having business dealings with it."

46.    As a foreseeable, direct and proximate result of Defendant's breaches of contract, Plaintiff has suffered damages.

47.    Plaintiff is entitled to recover actual and consequential damages, as well as attorneys' fees and costs.

**COUNT TWO**
**(Breach of Contract Accompanied by a Fraudulent Act)**

48.    Plaintiff incorporates Paragraphs 1 through 47 as if set forth fully herein.

49.    As set forth above, Plaintiff entered into valid contracts with Defendant, including in particular the SPA, and fully performed his material obligations under those contracts.

50.    As set forth above, Defendant has breached the SPA, and Defendant breaches were accompanied by Defendant's fraudulent intent to induce Plaintiff to pay a grossly and artificially inflated price for Harbor Services.

51.    As set forth above, Defendant's breaches of the warranties and representations in the SPA were accompanied by fraudulent acts by Defendant willfully and intentionally misrepresenting that the Atlanta VA Contract was viable while having and concealing his secret discussions with the VA in which Defendant stated the Atlanta VA Contract was at a standstill, the Company had his "back against the wall," and recommending that the VA should terminate that contract for convenience. Defendant misrepresented to Plaintiff in the SPA that the Atlanta VA Contract was in full force and effect, was not threatened with termination, and continued to have a value of $9,287,547; that the Company's "Financial Statements . . . fairly present . . . the financial condition, results of operations and cash flows of the Company;" and that there were no material adverse effects on the financial condition or operations of the Company for a period of one year before closing.

52.    As a foreseeable, direct and proximate result of Defendant's breaches of contract accompanied by fraudulent acts, Plaintiff has suffered damages.

53.    Plaintiff is entitled to recover actual, consequential, and punitive damages, as well as attorneys' fees and costs.

## COUNT THREE
### (Fraud in the Inducement)

54.     Plaintiff incorporates Paragraphs 1 through 53 as if set forth fully herein.

55.     Defendant made false representations to Plaintiff, including but not limited to the following:

    a.   That the Atlanta VA Contract was being performed in the normal course and without any ongoing investigations;

    b.   That it was reasonable and appropriate to include past and ongoing revenues and expected profits from the Atlanta VA Contract in determining the value of and purchase price for Harbor Services;

    c.   That the contracts and financial records provided to Plaintiff in the due diligence process accurately reflected the financial condition of Harbor Services;

    d.   That there were no material and adverse effects on Harbor Services within the prior year;

    e.   That the Atlanta VA Contract had a value of $9,287,547; and

    f.   That all Material Contracts (including the Atlanta VA Contract) were in full force and effect and were not threatened with termination.

56.     Each of these statements was false because, in fact, the Atlanta VA Contract was at a standstill, the VA was delaying making any modifications to reflect a change in scope of the project, and the Atlanta VA Contract was threatened with termination based on Defendant's own recommendation that the VA terminate the Atlanta VA Contract for convenience.

57.     Defendant knew his representations were false because he personally spoke with the VA and urged it to terminate the Atlanta VA Contract barely more than two weeks before the closing of the sale of Harbor Services to Plaintiff.

58.     Defendant knew Plaintiff was relying on Defendant's misrepresentations because he knew Plaintiff had no other means by which to determine the value of Harbor Services or to determine the status of the Material Contracts, including the Atlanta VA Contract.

13

59.     Defendant acted with the intention to deceive Plaintiff into purchasing Harbor Services for $3 million, when Defendant knew Plaintiff was using the falsely represented financial and contract information (as Plaintiff had no other information available to him) to value the Company, and that the Company was worth substantially less than $3 million because the Atlanta VA Contract was likely to be terminated as Defendant had recommended to the VA. Defendant was motivated by profits he would obtain through the sale of Harbor Services, which profits included not only the purchase price that was inflated by Defendant's fraudulent misrepresentations, but also retention of Company revenues and interest on a loan to Plaintiff.

60.     Plaintiff had no knowledge of the falsity of Defendant's representations, and reasonably relied upon those representations in entering into the SPA and paying the inflated value of $3 million to acquire Harbor Services. Plaintiff would not have purchased Harbor Services for $3 million if he knew of Defendant's deception and that the Atlanta VA Contract was threatened with and likely to be terminated, and/or he would have negotiated a substantially lower purchase price. Plaintiff had access to no information about the revenues of Harbor Services or the status of the Atlanta VA Contract other than the disclosures provided by Defendant during the due diligence period.

61.     As a direct, proximate and consequential result of Defendant's fraudulent inducement, Plaintiff has suffered damages.

62.     Plaintiff is entitled to recover actual, consequential and punitive damages, as well as an award of attorneys' fees and costs.

### COUNT FOUR
**(Constructive Fraud)**

63.     Plaintiff incorporates Paragraphs 1 through 62 as if set forth fully herein.

14

64.     Defendant made each of the misrepresentations set forth in Paragraph 55 above to Plaintiff.

65.     Defendant's representations were false and material in that they were essential to Plaintiff's decision to purchase Harbor Services and to Plaintiff's determination of the purchase price of the Company.

66.     Defendant knew his representations were false, he knew Plaintiff was relying on those representations, and he intentionally used such representations to induce Plaintiff to purchase Harbor Services for the grossly inflated price of $3 million.

67.     Plaintiff reasonably relied and had a right to rely on Defendant's representations and had no knowledge of their falsity. Plaintiff would not have purchased Harbor Services for $3 million if he knew of Defendant's deception and that the Atlanta VA Contract was threatened with and likely to be terminated, and/or he would have negotiated a substantially lower purchase price

68.     As a direct, proximate and consequential result of Defendant's fraudulent inducement, Plaintiff has suffered damages.

69.     Plaintiff is entitled to recover actual, consequential and punitive damages, as well as an award of attorneys' fees and costs.

## COUNT FIVE
### (Fraudulent Non-Disclosure)

70.     Plaintiff incorporates Paragraphs 1 through 69 as if set forth fully herein.

71.     Defendant assumed a position of trust and confidence with Plaintiff during the due diligence period because of the special relationship he undertook with respect to Plaintiff, as a result of the Non-Disclosure Agreement and the Letter of Intent, and because Plaintiff reposed trust and confidence in Defendant to disclose all material information necessary for Plaintiff to determine a reasonable value and purchase price for the Company. Defendant knew Plaintiff was

15

relying on their special, confidential and trusted relationship because Defendant knew Plaintiff had no other means by which to determine the value of Harbor Services or to determine the status of the Material Contracts, including the Atlanta VA Contract.

72.    As a result of this special, confidential and trusted relationship, Defendant owed Plaintiff a duty of candor and full disclosure.

73.    Defendant did not disclose that the Atlanta VA Contract was at a standstill, that the Company's back was "against the wall" with respect to the Atlanta VA Contract, that the VA was not timely agreeing to modify the Atlanta VA Contract to account for changes in scope, and that the Atlanta VA Contract was threatened with termination based upon Defendant's own recommendations that the VA terminate the Atlanta VA Contract for convenience.

74.    Defendant concealed these material facts, knowing that if Plaintiff had full disclosure, he would not purchase Harbor Services for the grossly inflated price of $3 million.

75.    As a direct, proximate and consequential result of Defendant's fraudulent non-disclosure, Plaintiff has suffered damages.

76.     Plaintiff is entitled to recover actual, consequential and punitive damages, as well as an award of attorneys' fees and costs.

## COUNT SIX
### (Negligent Misrepresentation)

77.    Plaintiff incorporates Paragraphs 1 through 76 as if set forth fully herein.

78.    Defendant made false representations to Plaintiff to induce Plaintiff to purchase Harbor Services at an inflated purchase price, including but not limited to the following:

        a.  That the Atlanta VA Contract was being performed in the normal course and without any ongoing investigations;

b. That it was reasonable and appropriate to include past and ongoing revenues and expected profits from the Atlanta VA Contract in determining the value of and purchase price for Harbor Services;

c. That the contracts and financial records provided to Plaintiff in the due diligence process accurately reflected the financial condition of Harbor Services;

d. That there were no material and adverse effects on Harbor Services within the prior year;

e. That the Atlanta VA Contract had a value of $9,287,547; and

f. That all Material Contracts (including the Atlanta VA Contract) were in full force and effect and were not threatened with termination.

79. In making these negligent false misrepresentations, Defendant had a pecuniary interest in selling Harbor Services to Plaintiff at a substantially higher purchase price than the Company was worth at that time, in removing capital from the Company as part of the sale transaction, and receiving interest on a loan made to Plaintiff in conjunction with the transaction.

80. Defendant owed a duty of care to see that he communicated truthful and complete information to Plaintiff.

81. Defendant breached that duty by failing to exercise due care in making the disclosures set forth in Paragraph 78 above to Plaintiff during the due diligence period. Defendant also breached that duty by failing to disclose the material facts as set forth in Paragraph 73 above.

82. Plaintiff justifiably relied on the truthfulness, accuracy and completeness of disclosures and on Defendant to use due care in making such disclosures during the due diligence period. The Non-Disclosure Agreement and the Letter of Intent were entered into specifically to ensure that Defendant could provide thorough transparency to Plaintiff during due diligence without any concern of compromising confidential, sensitive or trade secret information.

83. Plaintiff suffered a pecuniary loss as a result of Defendant's negligent misrepresentations and failure to disclose by paying an inflated purchase price for Harbor Services,

believing in good faith that all contracts were in good standing, when in fact the largest Material Contract in the Company's portfolio (the Atlanta VA Contract) was threatened with being terminated by the VA at the request of Defendant, which termination occurred barely one month after Plaintiff purchased the Company.

84.     Plaintiff is entitled to recover actual, consequential and punitive damages, as well as an award of attorneys' fees and costs.

### COUNT SEVEN
### (Breach of Fiduciary Duty)

85.     Plaintiff incorporates Paragraphs 1 through 84 as if set forth fully herein.

86.     During the due diligence period preceding his purchase of all stock in Harbor Services and thereafter, Plaintiff imposed a special confidence in Defendant so that Defendant, in equity and good conscience, was bound to act in good faith and with due regard to the interests of Plaintiff. The Letter of Intent executed on November 4, 2020, expressly required Defendant to "use their reasonable best efforts to negotiate, in good faith, the [SPA] as soon as practicable." The Non-Disclosure Agreement and the Letter of Intent created a confidential relationship between the parties.

87.     Because of the special relationship of trust existing between Plaintiff and Defendant during the due diligence period, Defendant was acting in a fiduciary relationship to Plaintiff.

88.     Defendant had a duty to disclose any and all material information relating to the operations and financial condition of Harbor Services – and specifically to disclose if any significant contracts were expected to be terminated in the near future – before the transfer of stock in the Company was finalized on March 1, 2021.

89. Defendant breached his fiduciary duties to Plaintiff – including the duties of utmost care, loyalty, candor, and good faith – by failing to disclose and affirmatively concealing the material fact that Defendant was requesting and fully expected the VA to terminate the Atlanta VA Contract for convenience at the very same time that Plaintiff was engaging in the due diligence process with the express intention of purchasing all stock in the Company.

90. Plaintiff suffered and is entitled to damages as a result of Defendant's breach of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant for actual and consequential damages in an amount to be proven at trial but in excess of $1 million, punitive damages, as well as interest, costs, and attorneys' fees, and for such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all issues so triable.

Respectfully submitted,

*Attorneys for Plaintiff Sammy Hicks, III*

NELSON MULLINS RILEY & SCARBOROUGH LLP

/s/ Robert. H. Brunson
Robert H. Brunson
Federal Bar 4971
E-Mail: robert.brunson@nelsonmullins.com
Olesya Bracey
E-Mail: olesya.bracey@nelsonmullins.com
151 Meeting Street, Suite 600
Charleston, South Carolina 29401
Telephone: 843-534-4226
Facsimile: 843-722-8700

Mark S. VanderBroek *(pro hac vice forthcoming)*

19

E-Mail: mark.vanderbroek@nelsonmullins.com
Atlantic Station
201 17th Street NW, Suite 1700
Atlanta, GA 30363
Telephone: 404-322-6675
Facsimile: 404-322-6050

Charleston, South Carolina

December 17, 2021